# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                       Case No:   6:17-cv-36-Orl-31KRS

YVES DEMESMIN, UNIK TAX
REFUND, LLC, UJM TAX SERVICES,
LLC, ELIE DORCEUS, LOYAL
EXPERIENCE DEPENDABLE TAX
SERVICE, LLC, LED FINANCIAL
SERVICE, LLC, MARIO COOPER, DIA
FLEMING, DIA I. FLEMING, LLC,
YVESDEMESMIN, LLC and JOSEPH
DEMESMIN,

        Defendants.

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **UNITED STATES' MOTION FOR DEFAULT JUDGMENT AGAINST YVES DEMESMIN, UNIK TAX REFUND, LLC, AND YVESDEMESMIN, LLC (Doc. No. 134)** |
| **FILED:** | **September 7, 2018** |

## I.  BACKGROUND.

On January 9, 2017, the United States filed its Complaint for Permanent Injunction and Other

Relief against Defendants Yves Demesmin; Unik Tax Refund, LLC ("Unik"); UJM Tax Services,

LLC ("UJM"); Elie Dorceus; Loyal Experience Dependable Tax Service, LLC ("Loyal Experience

Dependable"); LED Financial Service, LLC ("LED"); Mario Cooper; Dia Fleming; Dia I. Fleming,

LLC ("Fleming LLC"); YvesDemesmin, LLC ("Demesmin LLC"); and Joseph Demesmin.   Doc. No. 1.   On April 30, 2018, the Court granted the United States' motion for summary judgment as to its claims against UJM, Elie Dorceus, Loyal Experience Dependable, LED, Mario Cooper, Dia Fleming, Fleming LLC, and Joseph Demesmin (collectively, the "Non-Defaulted Defendants"). Doc. No. 112.   The Court entered a permanent injunction against the Non-Defaulted Defendants and entered monetary judgments against them.   *Id.*[1]

Following a motion by the United States, a Clerk's default was entered as to Yves Demesmin ("Mr. Demesmin") on June 20, 2018.   Doc. Nos. 120, 121.   Following another motion by the United States, Clerk's defaults were entered as to Unik and Demesmin LLC on August 7, 2018. Doc. Nos. 128-130.[2]   The United States then filed a motion for default judgment.   Doc. No. 131. I struck that motion because it exceeded the page limit set forth in Local Rule 3.01(a).   Doc. No. 133.   I also noted that, even if the motion were not due to be stricken, it was due to be denied because it did not establish, with citations to legal authority, that the complaint provided a sufficient legal basis for the entry of a default judgment.   *Id.*   I required that a renewed motion, among other things, provide, in the discussion section, pinpoint citations to the portions of the complaint (by paragraph number).   *Id.* at 2-3.

The United States filed a renewed motion on September 7, 2018.   Doc. No. 134.   In the motion, it requested a permanent injunction and an order requiring the Defaulted Defendants to disgorge their ill-gotten gains.   It attached the following to its motion:

---

[1] The Court subsequently amended its judgment to eliminate a superfluous instruction to the Clerk. Doc. No. 114.

[2] I collectively refer to Mr. Demesmin, Unik and Demesmin LLC as the "Defaulted Defendants." The history of United States' attempts to obtain Clerk's defaults against the Defaulted Defendants is complicated and has been set out in more detail elsewhere.   For purposes of this Report and Recommendation, I focus only on the relevant procedural history.

- A declaration from one of its attorneys, Daniel Applegate, in which Attorney Applegate avers that Mr. Demesmin is neither an infant nor an incompetent person (both of which would have required special service under Fed. R. Civ. P. 4(g) and that Mr. Demesmin is not currently on active duty in the United States military (which would prevent the Court from entering a default judgment against him under 50 U.S.C. § 3931) (Doc. No. 134-1);

- A declaration from IRS Revenue Agent Christopher Dickerson (Doc. No. 134-2);

- A declaration from paralegal Amanda Reinken (Doc. No. 134-3);

- A report showing that Mr. Demesmin is not on active military duty (Doc. No. 134-4);

- A declaration from Karin Messinger, who is a business records custodian for EPS Financial (Doc. No. 134-5); and

- A declaration from Megan Soleau, who is a business records custodian for Refundo, Inc. (Doc. No. 134-6).

The United States also filed a CD that includes Exhibits B-Q and T-V to its motion, which could not be readily converted to PDF format for electronic filing. *See* Doc. No. 135. That CD is available for the Court's review.

The United States served its motion and the CD of exhibits on the Defaulted Defendants, Doc. No. 134, at 26; Doc. No. 135, at 2. As of the writing of this Report and Recommendation, the Defaulted Defendants have not responded to the motion, and the time for doing so has passed. Thus, the United States' motion is ripe for review.

## II.   LEGAL STANDARD.

A court may enter a default judgment only if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for such entry. *See Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law."). Therefore, in considering a motion for default judgment, a court must "examine the sufficiency of plaintiff's allegations to determine

whether plaintiff is entitled to" a default judgment.  *Fid. & Deposit Co. of Md. v. Williams*, 699 F. Supp. 897, 899 (N.D. Ga. 1988).

The Supreme Court has explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  This analysis applies equally to motions for default judgment.  *De Lotta v. Dezenzo's Italian Rest., Inc.*, No. 6:08-cv-2033-Orl-22KRS, 2009 WL 4349806, at *5 (M.D. Fla. Nov. 24, 2009) (citations omitted).

"Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default.  Rather the Court determines the amount and character of the damages to be awarded."  *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999).  If a default judgment is warranted, the court may hold a hearing for purposes of assessing damages.  Fed. R. Civ. P. 55(b)(2); *see also SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).  However, a hearing is not necessary if a party submits sufficient evidence to support the request for damages.  *Smyth*, 420 F.3d at 1232 n.13.

## III.   ALLEGATIONS OF THE COMPLAINT.

A.   <u>The Defaulted Defendants</u>.

Mr. Demesmin resides in Mt. Dora, Florida.  Doc. No. 1 ¶ 5.  In 2011, he incorporated Demesmin LLC with the State of Florida.  *Id.* ¶ 6.  In 2013, he incorporated Unik with the State of Florida.  *Id.* ¶ 7.  Both Demesmin LLC and Unik are currently inactive.  *Id.*  Mr. Demesmin was the sole member of Demesmin LLC and Unik.  *Id.*

In 2008, non-party Walner Gachette began a tax preparation business in Orlando called LBS Tax Services ("LBS").   *Id.* ¶ 21.   In 2012, Mr. Demesmin became a district sales manager at an LBS store in Orange City, Florida.   *Id.*¶ 22.   In 2013, Mr. Demesmin became a franchisee of an LBS store in Daytona Beach, Florida, and, as such, owned and operated that store.   *Id.* ¶¶ 8, 23. His store prepared at least 577 tax returns in 2013.   *Id.* ¶ 23.

Beginning in 2014, Mr. Demesmin owned and operated tax return preparation stores under the name Unik Tax Refund, with at least seven locations in Orlando, Daytona Beach, Deltona, Titusville, Bunnell, Cocoa, and Lake Wales, Florida.   *Id.* ¶¶ 8, 24.   In 2014 and 2015, Unik Tax Refund stores prepared at least 1,398 and 817 federal income tax returns, respectively.   *Id.* ¶ 8.

Mr. Demesmin prepares tax returns for compensation.   *Id.* ¶ 19.   He employs individuals, directly or through Unik and Demesmin LLC, who prepare tax returns for compensation.   *Id.*

B.     Business Structure.

Each of the Defaulted Defendants' stores was managed by an individual who may be known as a District Sales Manager ("DSM").   *Id.* ¶ 32.   The Defaulted Defendants recruited DSMs who had no prior tax preparation or business experience.   *Id.*   DSMs, in turn, oversaw office managers, tax return preparers, and marketers.   *Id.*   The Defaulted Defendants, however, bore ultimate authority for their stores.   *Id.*

The Defaulted Defendants did not require the DSMs and tax returns preparers they employed to have any tax return preparation experience, knowledge of federal tax laws or accounting, or minimum education.   *Id.* ¶ 33.   They failed to teach managers and tax return preparers crucial elements to basic tax return preparation.   *Id.* ¶ 34.   They trained and instructed their tax return preparers on how to prepare tax returns that improperly claimed bogus refunds based on false claims,

credits, and deductions.  *Id.* ¶ 35.  They did this to falsely and improperly maximize customers'

tax refunds and to maximize the fees extracted from those refunds.  *Id.*

The Defaulted Defendants provided instruction sheets to managers and tax return preparers

that directed the preparers to input specific information into the tax preparation software to create

the maximum bogus refund for customers.  *Id.*¶ 36.  The Defaulted Defendants also provided

scripts directing employees on how to interact with customers, including scripts informing

customers that they would be receiving a refund.  *Id.*  Not all customers, however, legally qualified

for a refund.  *Id.*  The purpose of these scripts was to solicit customers and, once those customers

had come in the door, to run up tax preparation fees by including bogus claims, credits, and

deductions by attaching unnecessary forms to the return at an additional charge to the customer.

*Id.* ¶ 37.  The Defaulted Defendants included bogus claims, credits, and deductions on the forms to

generate a higher refund for the customer and, thus, justify additional (and often undisclosed) tax

return preparation fees.  *Id.*

The Defaulted Defendants delivered on their promise of a refund.  *Id.* ¶ 38.  For example,

for the tax returns listing the identification number of Demesmin LLC or Unik as the paid preparer,

99% claimed a refund in 2014 and 100% claimed a refund in 2013.  *Id.*

C.      The Defaulted Defendants' Activities.

The Defaulted Defendants, and those acting in concert with them and at their direction,

created and maintained a tax preparation business that promotes and encourages the preparation of

false and fraudulent federal income tax returns to generate bogus refunds and charge exorbitant fees,

thereby maximizing profits at the expense of the United States Treasury.  *Id.* ¶ 39.  Many of the

Defaulted Defendants' customers lacked knowledge regarding tax law and tax return preparation.

*Id.* ¶ 40.  They often had no knowledge that the Defendants and their tax return preparers had

prepared and filed false returns on their behalf. *Id.* For other customers, the tax return preparers—with the Defaulted Defendants' consent and urging—misled customers about what could be "legally" claimed on their tax returns and promised thousands of dollars of (illegal) refunds to convince them to have the Defaulted Defendants prepare their tax returns. *Id.* The Defaulted Defendants used aggressive marketing techniques that effectively guaranteed customers that they would receive tax refunds. *Id.*¶¶ 46-51. For example, the Defaulted Defendants' advertising suggested that customers with children would receive a tax refund if they had their tax return prepared at the Defaulted Defendants' stores. *Id.* ¶¶ 47-48.

Mr. Demesmin, individually and through Unik and Demesmin LLC, repeatedly and continually prepared or submitted tax returns or portions thereof (or employed or managed others who prepared or submitted tax returns or portions thereof) that contained unreasonable positions and substantially understated the liability for tax on the return. *Id.* ¶ 231. Mr. Demesmin also advised, instructed, directed, and caused his managers, preparers, and employees to engage in tax fraud, and to prepare federal income tax returns asserting unreasonable, unrealistic, frivolous, and fraudulent positions. *Id.* Accordingly, Mr. Demesmin knew or should have known of the unreasonable, unrealistic, frivolous, and fraudulent positions. *Id.*

Details of the Defaulted Defendants' practices are discussed below.

1.  *False Claims for EITC and Failure to Comply with Due Diligence Requirements.*

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, prepared tax returns that included fraudulent claims for the Earned Income Tax Credit ("EITC"), often based on fabricated business income and expenses, bogus or improperly-claimed dependents, and/or false filing status. *Id.* ¶ 52. The EITC is a refundable tax credit available to certain low-income working people. *Id.* ¶ 53. Because the EITC is a refundable

credit, claiming an EITC can, in certain circumstances, reduce a taxpayer's federal tax liability below zero, entitling the taxpayer to a payment from the United States Treasury.  *Id.*  Due to the method used to calculate the EITC, an individual can claim a larger EITC by claiming multiple dependents; moreover, for certain income ranges, individuals with higher earned income are entitled to a larger credit than those with lower earned income.  *Id.* ¶ 54.  The amount of the credit increases as income increases between $1 and $13,650; it decreases as income increases beyond $17,830.  *Id.* For the tax year 2014, the maximum EITC was $6,143 and was available to eligible individuals with three dependent children who earned income between $13,650 and $17,830.  *Id.*  Some tax preparers who manipulate reported income to maximize the EITC refer to this as the "sweet spot" or "golden range."  *Id.*

To bring a customer's reported earned income within the "sweet spot," the Defaulted Defendants and their employees (acting at the direction of the Defaulted Defendants) falsified information.  *Id.* ¶ 56.  For example, they would create a phony business on a customer's Form Schedule C, "Profit or Loss from Business (Sole Proprietorship)," in order to report fabricated income or expenses to make a customer purportedly qualify for the maximum EITC.  *Id.* ¶ 43. They would then inflate or fabricate Schedule C income to fraudulently increase customers' reported income or claim bogus Schedule C expenses to fraudulently decrease customers' reported earned income.  *Id.* ¶¶ 52-57; *see also id.* ¶ 43 (Mr. Demesmin initially instructed his employees at Unik to report on Schedules C $10,000 in income for customers claiming one dependent child and $16,000 in income for customers claiming two dependent children).

Because of the potential for abuse in claiming the EITC, Congress authorized the Secretary of the Treasury to impose "due diligence" requirements on federal tax return preparers claiming the EITC.  *Id.* ¶ 58; *see also* 26 U.S.C. § 6695(g).  Under these requirements, tax return preparers are

required to make "reasonable inquiries" to ensure the customer is legitimately entitled to the EITC, document their compliance with that requirement, and keep that documentation for three years. Doc. No. 1 ¶ 58. The Defaulted Defendants and their employees acting at their direction utterly failed to comply with the due diligence requirements and showed an intentional disregard for the tax laws. *Id.* ¶ 59. Not only did the Defaulted Defendants fail to adhere to the due diligence requirements, they falsified information to maximize the EITC for their customers. *Id.*; *see also id.* ¶¶ 107 (detailing fraudulently inflated EITC for Customer 7), 125 (same for Customer 11), 140 (same for Customers 14 and 15), 157 and 159 (same for Customer 20), 206 (same for Customer 32), 149 (falsely reporting on Form 8867, Paid Preparers Earned Income Checklist, that Customer 17 provided school records, health records, and medical records to demonstrate the residency of her child).

## 2. *Improper Filing Statuses and Bogus Dependents.*

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, prepared tax returns reporting false filing statuses. *Id.* ¶ 60. Specifically, they would claim Head of Household filing status on customers' tax returns to increase the amount of the customers' standard deduction, even though the Defaulted Defendants and their employees were aware that the customer did not qualify for Head of Household filing status. *Id.*; *see also id.* ¶¶ 123 (using false Head of Household status for Customer 11), 142-144 (same for Customer 16), 155 (same for Customer 20). They would file separate returns for married couples who were not living apart and improperly use the "head-of-household" or "single" filing status for those customers, even though those statuses are unavailable to married couples living together. *Id.* ¶ 61; *see also id.* ¶ 142 (preparing two separate tax returns for a married couple, Customers 16 and 17). Often, they did this in an attempt to increase the claimed EITC because a qualifying married couple

living together can, in certain circumstances, receive a larger refund if they falsely claim Head of Household or single status.  *Id.* ¶ 61.

In addition, the Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, claimed dependents who did not actually qualify as dependents on customers' tax returns.  *Id.* ¶ 62.  They then claimed Head of Household filing status for the customers to increase the customers' refunds through both the false filing status and the fraudulent EITC claim based on the bogus dependents.  *Id.*

### 3. *Fabricated Schedule C Business Income and Expenses.*

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, prepared tax returns reporting non-existent businesses on bogus Forms Schedule C.  *Id.* ¶ 63.  On some of these returns, the Defaulted Defendants and their employees reported substantial income, but little or no expenses.  *Id.*  On other returns, the Defaulted Defendants and their employees reported substantial expenses, but little or no income.  *Id.*  The determining factor was whether the Defaulted Defendants needed to inflate a customer's income (or create income when the customer had none), or to lower the taxable income of a customer who had actual income (i.e. W-2 wages), in order to either bring the income within the EITC "sweet spot" or simply to create a phony business loss to offset the customer's wages and falsely reduce the customer's income tax liability.  *Id.*; *see also id.* ¶¶ 64 (falsely reporting business expenses on Customer 1's Schedule C); 139 (same for Customer 14), 143 (same for Customer 16), 156 and 158 (same for Customer 20), 161 (same for Customer 21), 173 (same for Customer 24), 205 (same for Customer 32), 148 (falsely reporting the existence of business income on Customer 17's Schedule C).

The Defaulted Defendants provided their preparers, at the time of preparing a customer's return, with fabricated numbers to place on a Schedule C to maximize a customer's refund. *Id.* ¶ 65. These "number ranges" directed which fabricated numbers to input into the tax return software to generate a phony Schedule C that would fraudulently maximize a customer's refund. *Id.*

Even when customers were actually self-employed, the Defaulted Defendants ignored the actual income and expenses incurred by the customer and reported a fabricated amount to claim a maximum EITC. *Id.* ¶ 66. For example, Customer 3 ("C3") of Sanford, Florida, had her 2014 federal income tax return prepared at the Unik Tax Refund store in Deltona, Florida. *Id.* C3 was self-employed as a hair stylist and kept records of her income and expense. *Id.* The Unik Tax Refund preparer who prepared her return did not, however, look at her records, but falsely told C3 that there was a tax "bracket" for hair dressers. *Id.* C3, therefore, did not give the preparer any records related to her business. *Id.* The preparer then fabricated numbers on the Schedule C attached to C3's tax return, which resulted in C3's 2014 tax return falsely claiming an EITC in the amount of $5,460 and a bogus refund of $4,981. *Id.*; *see also id.* ¶¶ 67-69 (providing other examples of the Defaulted Defendants fabricating Forms Schedule C).

### 4. *Fraudulent Schedule F Farming Income and Expenses*.

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, prepared tax returns reporting non-existent farming income or expenses on bogus Forms Schedule F. *Id.* ¶ 70. Such forms are properly used to report income and expenses related to farming; this does not include wages or income derived by an employee or contract laborer who works on a farm. *Id.* The Defaulted Defendants, and their employees acting at their direction and with their consent, frequently reported phony income and/or expenses for customers who did not own a farm or have any business relationship with a farm. *Id.* On some of the bogus Forms

Schedule F, they reported substantial income, but little or no expenses.  *Id.* ¶ 71.   On other Forms Schedule F, they reported substantial expenses, but little or no income.  *Id.*   The determining factor was whether the tax return preparer needed to inflate a customer's income (or create income when the customer had none) to bring the income within the EITC range or "sweet spot," to lower the taxable income of a customer who had actual income (such as W-2 wages) to bring the income within the EITC range or "sweet spot," or simply to create a phony farming loss to offset the customer's wages and fraudulently reduce the customer's income tax liability.  *Id.*   The phony Forms Schedule F were commonly prepared in connection with Forms 4136, "Credit for Federal Tax Paid on Fuels," in an effort to conceal the fraudulent nature of the fuel tax credits claimed on customers' tax returns.  *Id.* ¶ 70; *see also id.* ¶¶ 100-03 (detailing fraudulent Schedule F filed for Customer 5), 104-05 (same for Customer 6), 107-09 (same for Customer 7), 110-11 (same for Customer 8), 114-17 (same for Customer 9), 118-21 (same for Customer 10), 125 (same for customer 11), 128-29 (same for customer 12), 134 (same for customer 13), 202 (same for Customer 31).

>            5.      *Fraudulent Fuel Tax Credits.*

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, prepared and filed federal income tax returns for customers on which they improperly claimed false or fraudulent fuel tax credits using IRS Form 4136, "Credit for Federal Tax Paid on Fuels."  *Id.* ¶ 72.   The fuel tax credit is available only to taxpayers who operate farm equipment or other off-highway business vehicles; moreover, the equipment or vehicles using the fuel must not be registered for highway uses.  *Id.*   The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, improperly claimed the fuel tax credit for fabricated business motor fuel purchases, particularly those purportedly related to farming.  *Id.*;

*see also id.* ¶ 77; *see also id.* ¶¶ 100-02 (detailing fraudulent fuel tax credit form filed for Customer 5), 104-05 (same for Customer 6), 108 (same for Customer 7), 112 (same for Customer 8), 116 (same for Customer 9), 120 (same for Customer 10), 126 (same for Customer 11), 130 (same for Customer 12), 135 (same for Customer 13), 202 (same for Customer 31).

6.      *Bogus Schedule A Deductions.*

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, prepared tax returns reporting bogus itemized deductions on Forms Schedule A, "Itemized Deductions," to improperly or fraudulently reduce customers' taxable income.  *Id.* ¶ 78.   For example, they fabricated (or falsely inflated) charitable contributions, medical expenses, and mortgage interest purportedly paid by their customers.  *Id.*   They also prepared tax returns for customers which included Forms Schedule A that made false claims for purported unreimbursed employee business expenses, particularly for purported business miles driven by customers.  *Id.* ¶ 79.

7.      *Bogus Education Credits.*

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, claimed bogus education expenses and falsely claimed refundable education credits, including the American Opportunity education credit, on customers' federal income tax returns.  *Id.* ¶ 80.   They claimed false education credits on the tax returns of customers who did not attend college and had no qualifying education expenses, in order to fraudulently reduce their customers' taxable income and generate a larger bogus refund (and increase the fees that they charged to customers).  *Id.*; *see also id.* ¶ 124 (falsely claiming an American Opportunity Education credit for Customer 11).

8.      *Improperly Preparing and Filing Returns Based on Pay Stubs.*

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, prepared and filed federal income tax returns using customers' end-of-year pay stubs and then filed their customers' tax returns without valid Forms W-2.   *Id.* ¶ 81.   In other instances, an IRS Form 4852, "Substitute for Form W-2," was attached to customers' returns, which falsely claimed that the employer did not timely issue a Form W-2.   *Id.*   In reality, the returns were prepared before the end of the tax year and/or before the employer even had the ability to issue a Form W-2 for that year.   *Id.*   Using pay stubs to prepare and file a tax return violates IRS rules. *Id.* ¶ 82.   Pay stubs often omit income and distributions that are shown on employer-issued Forms W-2.   *Id.*   The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, knew that using pay stubs to prepare and file returns violates IRS rules and regulations.   *Id.* ¶ 83.

9.      *Unconscionable and Undisclosed Fees.*

The Defaulted Defendants charged unconscionably high fees to prepare tax returns, mostly through added fees which were typically charged without customers' knowledge.   *Id.* ¶ 89.   They charged up to $999 (or more) to prepare and file fraudulent tax returns with unnecessary and bogus forms and schedules attached, when they should have honestly prepared a basic Form 1040 tax return.   *Id.*; *see also id.* ¶ 102 (Customer 5)   The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, charged additional fees for each form and schedule attached to the Form 1040 tax return.   *Id.* ¶ 91.   These fees resulted in a total fee much higher than the amount advertised and created a strong incentive for the Defaulted Defendants and their employees to prepare and file fraudulent returns claiming excessive refunds based on bogus claims and associated forms and schedules.   *Id.* ¶ 91-92.   The Defaulted Defendants, and their

employees acting at their direction and with their knowledge and consent, intentionally deceived customers regarding the fees charged; employee were trained not to disclose the full amount of the fee and, when having the customer sign forms showing the fee, to cover the fee with a hand or a piece of paper.  *Id.* ¶ 90; *see also id.* ¶ 136 (preparer did not tell Customer 13 how much she was being charged to have the tax return prepared).   Alternatively, they told customers one amount for fees and then later increased the fees without the customers' knowledge or consent.  *Id.* ¶ 94.  Customers did not pay the fees at the time the Defaulted Defendants prepared their returns.  *Id.* ¶ 95.  Instead, the fees were subtracted from the customers' tax refunds, thereby concealing from unsuspecting customers the actual amount the customers paid to have their return prepared.  *Id.*

Because the Defaulted Defendants targeted low-income individuals, the high fees can pose a significant financial hardship for customers.  *Id.* ¶ 93.   When customers are required to return bogus refunds to the government, they must also return the portion subtracted as fees.  *Id.*   They are then out-of-pocket the high fees charged by the Defaulted Defendants.  *Id.*

<blockquote>10. <i>Failure to Provide Customers with Copies of their Completed Tax Returns.</i></blockquote>

The Defaulted Defendants, and their employees acting at their direction and with their knowledge and consent, failed to provide customers with copies of their completed tax returns.  *Id.* ¶ 97; *see also id.* ¶¶ 113 (Customer 8), 131 (Customer 12).   Customers who did receive a copy of the return often did not receive the whole return, including attached forms and schedules.  *Id.* ¶ 99.

D.  <u>Previous Investigations and Lack of Deterrence</u>.

In February 2014, H&R Block sued Mr. Demesmin and Unik in Volusia County, Florida, alleging, among other things, that they prepared "materially false returns without the knowledge or consent of the taxpayer," misrepresented the amount of refunds they could legally obtain for customers, charged high fees without their customers' knowledge, and attempted to conceal their

unlawful and deceptive acts from customers.  *Id.* ¶ 213.   On October 24, 2014, the Florida circuit courted ordered Mr. Demesmin and Unik to, among other things, cease and desist from preparing false tax returns, preparing false documents attendant to such returns (such as due diligence forms), failing to fully disclose fees to customers, and misrepresenting that their fraudulent practices were lawful.  *Id.*  ¶ 214.   Despite knowledge of the widespread and pervasive fraudulent conduct surrounding Mr. Demesmin's tax preparation business, notably from the H&R Block lawsuit, several lawsuits filed by the United States against owners and franchisees of LBS Tax Services, a lawsuit filed against LBS by the State of Texas, the IRS's examinations of the Defaulted Defendants' customers' tax returns, and well-publicized complaints by customers and consumer protection organizations, the Defaulted Defendants have continued to prepare and file fraudulent tax returns and have not taken any meaningful steps to stop the fraud.  *Id.* ¶ 215.   They have little incentive to stop the wrongdoing because they directly profit from the misconduct at their tax preparation stores.  *Id.* ¶ 216.

     E.    <u>Harm Caused by Defendants</u>.

Defendants' actions (described above) have harmed the public and the United States Treasury.   *Id.*¶ 217.   Their actions have harmed the public because they prepared false or fraudulent tax returns that illegally caused customers to incorrectly report their federal tax liabilities and underpay their taxes.   *Id.*   Many of their customers, who are often low-income taxpayers, now face large income tax debts and may be liable for penalties and interest.   *Id.* ¶ 223.   Customers were also harmed by the unconscionably high and frequently undisclosed fees tied to anticipated tax refunds.   *Id.* ¶ 224.   The Defaulted Defendants' conduct also harmed honest tax return preparers, who lost business to the Defaulted Defendants.   *Id.* ¶ 226.   The public has also been harmed

because the Defaulted Defendants' misconduct undermines public confidence in the federal tax system and encourages widespread violations of the internal revenue laws.   *Id.* ¶ 227.

The Defaulted Defendants' actions have harmed the United States Treasury by causing lost tax revenue.   *Id.* ¶ 218.   The IRS examined 9 of the 77 tax returns that Mr. Demesmin himself prepared in 2012.   Of those 9 returns, 8 required adjustments, with an average tax deficiency of $4,205.75 per return.   *Id.* ¶ 219.   The IRS examined 72 of the approximately 577 tax returns filed by Unik in 2013 and made adjustments to 56.9% of those returns, with an average tax deficiency of $2,916.95 per return.   *Id.* ¶ 220.   The IRS is also in the process of examining 301 of the 1,398 tax returns filed by Unik in 2014.   *Id.* ¶ 221.   Of the completed examinations of returns prepared in 2014, the IRS made adjustments to 68.8% of the returns, with an average tax deficiency of $3,253.45 per return.   *Id.*   Based on the IRS's examination of tax returns prepared by Mr. Demesmin and Unik from 2012 to 2014 and the total number of returns prepared by them in that period, the IRS estimates that the tax loss caused by just these stores over these three years could be as much as $2.8 million or more.   *Id.* ¶ 222.   The Defaulted Defendants' actions also harm the United States and the public by forcing the IRS to devote scarce resources to detecting their false and fraudulent claims and attempting to collect lost tax revenues caused by those claims.   *Id.* ¶ 225.

The harm to the government and the public will continue, and likely increase, unless the Defaulted Defendants are enjoined because, without an injunction, they are likely to continue preparing false and fraudulent federal income tax returns for customers.   *Id.* ¶ 228.   An injunction will serve the public interest because it will put a stop to the Defaulted Defendants' illegal conduct and the harm that such conduct causes the United States and its citizens.   *Id.*

## IV.     DISCUSSION.

The United States' complaint includes four claims.   Count I is a request for an injunction under 26 U.S.C. § 7407.   Count II is a request for an injunction under 26 U.S.C. § 7408.   Count III is a request for an injunction under 26 U.S.C. § 7402(a).   Count IV requests, pursuant to 26 U.S.C. § 7402(a), that the Court order the Defaulted Defendants to disgorge to the United States the gross receipts that they received for the preparation of federal tax returns making grossly incompetent, negligent, reckless, and/or fraudulent claims.   I discuss each of the claims for injunctive relief and disgorgement separately, below.

A.     Injunctive Relief.

1.     *Count I: Injunction Under 26 U.S.C. § 7407.*

In Count I of the complaint, the United States requests an injunction under 26 U.S.C. § 7407. Section 7407 allows, in relevant part, for injunctive relief against a "tax return preparer" who has (a) engaged in any conduct subject to penalty under 26 U.S.C. §§ 6694 or 6695; or (b) engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the internal revenue laws.   26 U.S.C. §§ 7407(a), 7407(b)(1)(A), (D).   Once the government establishes any of the prohibited conduct or other violations enumerated in § 7407, it need only demonstrate "that injunctive relief is appropriate to prevent the recurrence of such conduct."   26 U.S.C. § 7407(b)(2); *see also United States v. Prater*, No. 8:02-cv-2052-T-23MSS, 2005 WL 2715401, at *5 (M.D. Fla. Sept. 23, 2005) (citations omitted).   In addition, if the court finds that conduct was continual or repeated and that an injunction prohibiting such conduct would not be sufficient to prevent the defendant's interference with the proper administration of the Internal Revenue Code, the court may enjoin the defendant from acting as a tax return preparer.   26 U.S.C. § 7407(b)(2).

Under this standard, I recommend that the Court issue an injunction under § 7407.   I discuss each of the elements, separately, below.

        a.      The Defaulted Defendants are tax return preparers.

Under the Internal Revenue Code, a "tax return preparer" is, subject to certain exceptions not relevant here, "any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed by this title or any claim for refund of tax imposed by this title."   26 U.S.C. § 7701(a)(36)(A).   The term "person," in turn, means "an individual, a trust, estate, partnership, association, company or corporation."   *Id.* § 7701(a)(1).   By virtue of their default, the Defaulted Defendants have admitted that Mr. Demesmin personally prepared tax returns for compensation and employed individuals, directly or through Unik and Demesmin LLC, who prepared tax returns for compensation.   Doc. No. 1 ¶ 19.   They have also admitted that Unik and Demesmin LLC charged fees to prepare tax returns.   *See, e.g.*, *id.* ¶ 41 (noting that the Defaulted Defendants charged fees for preparing the return).   This is sufficient to establish that the Defaulted Defendants are "tax return preparers" within the meaning of the Internal Revenue Code.

        b.      The United States has adequately alleged conduct supporting an injunction under § 7407.

Under § 7407, a district court may enter an injunction against a tax return preparer who engages in conduct subject to penalty under 26 U.S.C. §§ 6694 or 6695.   26 U.S.C. § 7407(a), (b)(1)(A).   It may also enter an injunction against a tax return preparer who engages in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the internal revenue laws.   *Id.* § 7407(a), (b)(1)(D).   I recommend that the Court find that the United States has adequately alleged conduct supporting the issuance of an injunction under both theories, as discussed below.

     *i.*  *The Defaulted Defendants engaged in conduct prohibited under 26 U.S.C. §§ 6694 and 6695.*

  First, I recommend that the Court find that the Defaulted Defendants engaged in conduct prohibited by U.S.C. §§ 6694 and 6695.  Tax return preparers violate §§ 6694 and 6695 "by understating a taxpayer's liability due to an unreasonable position, recklessly or intentionally disregarding . . . IRS rules or regulations . . . , or claiming the Earned Income Tax Credit without complying with the statutory due diligence requirements."  *United States v. Stinson*, 661 F. App'x 945, 949 (11th Cir. 2016) ("*Stinson I*") (internal quotations and alterations omitted).[3]  Section 6694(b) also provides a penalty for a willful attempt to understate a customer's tax liability, and § 6695(a) provides a penalty for any tax return preparer who fails to present a copy of a tax return or claim for refund at the time it is presented for the taxpayer's signature.  By virtue of their default, the Defaulted Defendants have admitted that they, among other things, purposely fabricated business income and losses and farming income and losses in an attempt to manipulate their customers' incomes such that they fell within the EITC's "sweet spot," thereby reducing the customers' federal tax liability.  *See, e.g.*, Doc. No. 1 ¶¶ 52-57, 63-68, 70-71, 104-05, 106-09, 137-40, 231.  They have also admitted that they claimed the EITC for customers without complying with the EITC's due diligence requirements.  *See, e.g.*, *id.* ¶¶ 58-59, 233.  In addition, they have admitted that they failed to timely provide copies of completed tax returns to their customers.  *See, e.g.*, *id.* ¶¶ 97, 113, 131.  This is sufficient to establish violations of §§ 6694 and 6695.  *See also* Doc. No. 112, at 1-4 (finding violations of §§ 6694 and 6695 by the Non-Defaulted Defendants in this case based on evidence of conduct similar to the conduct alleged against the Defaulted Defendants); *United States v. Barwick*, No. 6:17-cv-35-Orl-18TBS, 2017 WL 5514257, at *2-4

---

[3] In this Report and Recommendation, unpublished decisions of the U.S. Court of Appeals for the Eleventh Circuit are cited as persuasive authority.

(M.D. Fla. Oct. 13, 2017), *report and recommendation adopted by* 2017 WL 5513632 (M.D. Fla. Nov. 16, 2017) (finding violations of §§ 6694 and 6695 on allegations similar to the allegations in this case).

> ii.   The Defaulted Defendants engaged in other fraudulent and deceptive conduct which substantially interferes with the proper administration of the internal revenue laws.

Second, I recommend that the Court find that the Defaulted Defendants engaged in other fraudulent and deceptive conduct which substantially interferes with the proper administration of the internal revenue laws as set forth in § 7407(b)(1)(D).   As set forth in detail, above, the Defaulted Defendants have admitted by virtue of their default that they created and maintained a tax preparation business that promoted and encouraged the preparation of false and fraudulent federal income tax returns to generate bogus refunds and charge exorbitant fees, thereby maximizing profits at the expense of the United States Treasury.  *See, e.g.*, Doc. No. 1 ¶ 39.  This is sufficient to establish that the Defaulted Defendants engaged in other fraudulent and deceptive conduct which substantially interferes with the proper administration of the internal revenue laws.  *See United States v. Sperl*, No. 3:06-0175, 2008 WL 2699402, at *9 (M.D. Tenn. June 30, 2008) (finding substantial interference with the proper administration of the internal revenue laws where the defendants undertook a scheme to create or inflate deductions and expenses in an effort to secure larger refunds for taxpayers, even though the defendants knew the taxpayers were not entitled to such deductions and expenses).

> c.   Injunctive relief is appropriate to prevent the recurrence of such conduct.

Because the United States has established that the Defaulted Defendants are income tax preparers within the meaning of the Internal Revenue Code and that they engaged in conduct described in § 7407(b)(1)(A) and (D), it need only demonstrate that "injunctive relief is appropriate

to prevent the recurrence of such conduct" in order to obtain an injunction prohibiting the Defaulted Defendants from engaging in further such conduct.   26 U.S.C. § 7407(b)(2); *see also Sperl*, 2008 WL 2699402, at *8 (citation omitted) (because of the express authorizations for the issuance of an injunction in the tax code, the traditional requirements for equitable relief need not be satisfied).   In addition, if the Court finds that a tax return preparer has continually or repeatedly engaged in this conduct and that an injunction prohibiting such conduct would not be sufficient to prevent future interference with the proper administration of the Internal Revenue Code, the Court may enjoin the Defaulted Defendants from acting as a tax return preparer.

As detailed, above, by virtue of their default, the Defaulted Defendants have admitted that they repeatedly and purposely fabricated false information for their customers' tax returns, all in an attempt to manipulate the customers' income and ensure the maximum refund.   They have admitted that they repeatedly failed to comply with the EITC's due diligence requirements and failed to provide customers with copies of their tax returns.   *See, e.g.*, Doc. No. 1 ¶¶ 52-50, 63-68, 70-71, 97, 104-05, 106-09, 113, 131, 137-40, 149, 231.   They have also admitted that they did not cease their fraudulent activities even after being sued by H&R Block, after being enjoined from such conduct by a Florida state court, and despite having knowledge of suits against related entities and IRS examinations of their customers' returns.   *Id.* ¶¶ 213-15.   Finally, they have admitted that they have an incentive to continue with their fraudulent conduct because they directly profit from it.   *Id.* ¶ 216.

On these facts, I recommend that the Court find that the United States has established that injunctive relief is necessary to prevent the recurrence of the Defaulted Defendants' conduct, thereby warranting an injunction prohibiting the Defaulted Defendants from engaging in further such conduct.   I also recommend that the Court find that the Defaulted Defendants have repeatedly

engaged in conduct described by § 7407(b) and that an injunction prohibiting such conduct would not be sufficient to prevent future interference with the proper administration of the Internal Revenue Code.   As argued by the United States, the Defaulted Defendants have shown a willingness to falsify tax returns in various ways.   Thus, "[a]n order barring only specific conduct will have no effect.   The Defendants will either disregard the order, further attempt to conceal their actions, find new ways to assist with tax return preparation, or find new phony claims to report on returns to skirt the language of a limited injunction."   Doc. No. 134, at 17.   The Defaulted Defendants have also failed to object to the entrance of such an injunction, despite having been served with the United States' motion for default judgment.   Thus, I recommend that the Court enter an injunction permanently prohibiting the Defaulted Defendants from acting as tax return preparers, as authorized by § 7407(b).   Notably, the Court has already issued such an injunction against the Non-Defaulted Defendants in this case, based on substantially the same allegations lodged against the Defaulted Defendants.   *See* Doc. No. 112; *see also Barwick*, No. 6:17-cv-35-Orl-18TBS, Doc. No. 34 (M.D. Fla. Nov. 20, 2017) (entering injunction permanently enjoining the defendants from acting as tax return preparers following grant of motion for default judgment in a case involving substantially the same allegations as those in this case).

> 2.      Count II: Injunction Under 26 U.S.C. § 7408.

In Count II of the complaint, the United States requests an injunction under 26 U.S.C. § 7408.   Under § 7408(b), a district court is authorized to enjoin any person from further engaging in certain specified conduct, including acts subject to penalty under 26 U.S.C. § 6701, if the court finds that the person has engaged in such conduct and if injunctive relief is appropriate to prevent recurrence of such conduct.   Section 6701(a), in turn, imposes a penalty on any person who: (1) "aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion

of a return, affidavit, claim, or other document"; (2) "knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal revenue laws"; and (3) "knows that such portion (if so used) would result in an understatement of the liability for tax of another person."   Violations of § 6701 include "ordering (or otherwise causing) a subordinate to do an act," as well as "knowing of, and not attempting to prevent, participation by a subordinate in an act."   26 U.S.C. § 6701(c)(1)(A)-(B); *see also Stinson I*, 661 F. App'x 949-50 (internal quotations omitted).

By their default, the Defaulted Defendants have admitted that they, and their employees acting at their direction, repeatedly prepared tax returns that purposely understated the income tax liability of their customers, by, for example, making fraudulent claims for the EITC, improperly claiming Head of Household filing status, fabricating business income and expenses, and fabricating farming income and expenses.   *See, e.g.*, Doc. No. 1 ¶¶ 41-45.   This is sufficient to establish that the Defaulted Defendants violated § 6701.   *See Stinson I*, 661 F. App'x at 951 (finding violations of § 6701 where evidence established actions similar to those alleged in the complaint in this case).

Once the United States shows that the Defaulted Defendants engaged in conduct subject to penalty under § 6701, the Court may issue an injunction under § 7408 if such relief is appropriate to prevent recurrence of that conduct.   26 U.S.C. § 7408.   As discussed above in connection with § 7407, injunctive relief is appropriate in this case.   *See also Barwick*, 2017 WL 5514257, at *4, *report and recommendation adopted by* 2017 WL 5513632 (finding injunctive relief appropriate under § 7408 in a case involving allegations similar to those in this case).

3.      Count III: Injunction Under 26 U.S.C. § 7402(a).

In Count III of the complaint, the United States requests an injunction under 26 U.S.C. § 7402(a).   Section 7402 authorizes a district court "at the instance of the United States . . . to make

and issue in civil actions . . . orders of injunction . . . as may be necessary or appropriate for the enforcement of the internal revenue laws."   The authority under § 7402 is "in addition to and not exclusive of any and all other remedies" available to enforce the internal revenue laws.   *Id.*   This broad grant of authority allows courts to "enjoin interference with tax enforcement even when such interference does not violate any particular tax statute."   *United States v. Ernst & Whinney*, 735 F.2d 1296, 1300 (11th Cir. 1984) (citations omitted).   Understating tax liability constitutes substantial interference with the internal revenue laws.   *See United States v. Pugh*, 717 F. Supp. 2d 271, 299-300 (E.D.N.Y. 2010).   The traditional factors for entry of a permanent injunction must be satisfied to issue an injunction pursuant to § 7402(a).   *United States v. Stinson*, 239 F. Supp. 3d 1299, 1324 (M.D. Fla. 2017), *relief from judgment granted by* 2017 WL 2493239 (M.D. Fla. May 21, 2017), *aff'd*, 729 F. App'x 891 (11th Cir. 2018) ("*Stinson II*") (citation omitted).

As explained above, by their default, the Defaulted Defendants have admitted that they, and their employees acting at their direction, systematically caused their customers to understate tax liability.   I have also recommended that the Court find that the complaint adequately alleges that the Defaulted Defendants interfered with the administration of the internal revenue laws.   Thus, an injunction is appropriate under § 7402(a) if the Court determines that the traditional equitable principles warrant it.   *See id.* at 1324-25 (finding that an injunction is appropriate if the traditional equitable principles warrant it in a case involving misconduct similar to that alleged in this case).

Under traditional equitable principles, the United States must demonstrate the following to show entitlement to a permanent injunction: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of the hardships between the United States and the Defaulted Defendants,

a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.   *Id.* at 1325 (citation omitted).

As to the first factor, by virtue of their default, the Defaulted Defendants have admitted that their actions have caused the United States Treasury to lose $2.8 million or more in tax revenue from 2012 to 2014.   Doc. No. 1 ¶ 222.   They have also admitted that the United States has had to expend administrative resources investigating them and conducting audits.   *Id.* ¶ 225.   This is sufficient to support a finding of irreparable injury.   *See Stinson II*, 239 F. Supp. 3d at 1325.   As to the second factor, the facts in this case support a finding that there is an inadequate remedy at law.   *See id.* ("[T]he Court finds that there is no adequate remedy at law because [defendant's] continued operation causes irreparable harm to his customers and the public at large and there is no way of stopping him from fraudulently preparing taxes absent an injunction.").

As for the third factor, by virtue of their default, the Defaulted Defendants have admitted that, if an injunction is not entered, they are likely to continue preparing false and fraudulent federal income tax returns for customers.   Doc. No. 1 ¶ 228.   This puts the United States Treasury at risk of being wrongfully depleted of funds, requires the United States to devote significant resources to monitoring the Defaulted Defendants, and puts the Defaulted Defendants' customers at risk.   On these facts, and in the absence of any objection from the Defaulted Defendants, I recommend that the Court find that the balance of hardships tips in the United States' favor.   *See Stinson II*, 239 F. Supp. 3d at 1325-26 (finding that the balance of hardships favors the United States in a case involving similar allegations).   Finally, I recommend that the Court find that the public interest would be served by the entry of an injunction, thereby satisfying the fourth factor.   As noted by Judge Conway in a similar case, "[T]he public has a strong interest in minimizing the number of false claims for refunds that are made and in ensuring that tax preparers follow the law.

Furthermore, as outlined above, [the defendant] harms his customers who are relying on his business to properly handle their taxes.   In return, [the defendant's] business exposes these primarily low-income customers to individual tax liability, added interest, and potential penalties."   *Id.* at 1326 (internal quotation and citation omitted).   Because all of the traditional equitable factors are met, I recommend that the Court find that it is appropriate to issue an injunction under § 7402(a).

    4.   Conclusion.

   As explained above, the United States has shown that it is entitled to injunctive relief under §§ 7402(a), 7407, and 7408.   In the complaint, the United States requests that the Court enter an injunction that prohibits the Defaulted Defendants, and all those in active concert or participation with them, from, among other things, acting as federal tax return preparers.   Doc. No. 1, at 69-77; *see also* Doc. No. 131-7.   The terms of the injunctive relief they request are generally consistent with the Judgment and Order of Permanent Injunction and Disgorgement that the Court has already entered against the Non-Defaulted Defendants.   Doc. No. 112.[4]   They are also generally consistent with the terms of the injunction issued by Judge Conway in a similar case.   *See Stinson II*, 239 F. Supp. 3d at 1329-30.   Accordingly, it would be within the Court's discretion to enter an injunction with terms consistent with those proposed by the United States.

---

[4] There are two differences.   First, the complaint requests the appointment of a receiver to sell the hard assets of Unik and Demesmin LLC.   Doc. No. 1, at 71-72 ¶ G.   Such a term was not included in the Court's Judgment and Order of Permanent Injunction and Disgorgement as to the Non-Defaulted Defendants. It is also does not appear that the United States still seeks to have a receiver appointed because it did not include such a term in the proposed order it attached to its previous motion for default judgment, *see* Doc. No. 131-7, and the United States' motion for default judgment also does not address whether it is appropriate to appoint a receiver.   Therefore, on the current record, I recommend that the Court not appoint a receiver. Second, the Court's Judgment and Order of Permanent Injunction and Disgorgement as to the Non-Defaulted Defendants includes a requirement that the Non-Defaulted Defendants post a message on their social media accounts stating that the Court has barred them from preparing tax returns indefinitely.   Doc. No. 112, at 9-10 ¶ I.   The complaint does not request such relief.

B.   <u>Disgorgement</u>.

In Count IV of the complaint, the United States seeks an order of disgorgement pursuant to 26 U.S.C. § 7402(a).   It seeks a judgment against the Defaulted Defendants, jointly and severally, in the amount of $1,251,456.54.   Doc. No. 134, at 25.   I discuss the United States' entitlement to an order of disgorgement and the amount of such an order separately, below.

1.   *Entitlement to Order of Disgorgement*.

Section 7402(a) of the Internal Revenue Code grants district courts broad authority to issue orders and judgments "as may be necessary or appropriate for the enforcement of the internal revenue laws."   26 U.S.C. § 7402(a).   This includes the remedy of disgorgement.   *See Barwick*, 2017 WL 5514257, at *4, *report and recommendation adopted by* 2017 WL 5513632.   Courts considering similar allegations of misconduct by tax return preparers have found that "[d]isgorgement in the amount of a defendant's 'ill-gotten gains' constitutes a 'fair and equitable' remedy as it reminds the defendant of its legal obligations, serves to deter future violations of the Internal Revenue Code, and promotes successful administration of the tax laws."   *Stinson II*, 239 F. Supp. 3d at 1326 (citation omitted); *see also Barwick*, 2017 WL 5514257, at *4, *report and recommendation adopted by* 2017 WL 5513632 (citation omitted).   In addition, the Court has already entered an order of disgorgement against the Non-Defaulted Defendants based on conduct that is very similar to the conduct alleged against the Defaulted Defendants.   Doc. No. 112. Accordingly, I recommend that the Court find that the United States is entitled to an order of disgorgement in this case.

2.   *Amount of Disgorgement*.

Once the Court determines that the United States is entitled to an order of disgorgement, the United States need only produce a reasonable approximation of the Defaulted Defendants' ill-gotten

gains. *Stinson II*, 239 F. Supp. 3d at 1327 (citing *S.E.C. v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004)). "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* (quoting *Calvo*, 378 F.3d at 1217). Once the United States presents its estimate, the burden shifts to the Defaulted Defendants to show that the United States' estimate was not a reasonable approximation. *Id.* (citing *S.E.C. v. Lauer*, 478 F. App'x 550, 557 (11th Cir. 2012)).

There must be a relationship between the amount of disgorgement and the amount of ill-gotten gains, and a court may not order disgorgement of an amount obtained without wrongdoing or during a time when there is no record evidence of fraud. *Id.* (citation omitted). That said, in cases involving the operation of a fraudulent business, courts accept gross receipts obtained by the defendant as a reasonable measure of disgorgement. *United States v. Stinson*, 729 F. App'x 891, 899 (11th Cir. 2018) (citation omitted) ("*Stinson III*"). Finally, joint and several liability is appropriate where two or more individuals or entities have close relationships in engaging in illegal conduct. *S.E.C. v. Monterosso*, 557 F. App'x 917, 928-29 (11th Cir. 2014) (citation omitted); *see also United States v. Barwick*, 2018 WL 1135414, at *2 (M.D. Fla. Jan. 25, 2018), *report and recommendation adopted by* 2018 WL 115701 (M.D. Fla. Feb. 27, 2018) ("*Barwick II*") (entering judgment against two individual defendants and corporation, jointly and severally, for disgorgement of ill-gotten gains in a case involving similar allegations).

Here, by virtue of their default, the Defaulted Defendants have admitted that Mr. Demesmin was the sole member of Unik and Demesmin, LLC. Doc. No. 1 ¶ 7. They have also admitted that Mr. Demesmin, directly and through Unik and Demesmin, LLC, owned and operated tax preparation stores in Florida under the names LBS Tax Services (2013) and Unik Tax Refund (2014 and 2015). *Id.* ¶ 8. This is sufficient to support a finding that the Defaulted Defendants should be held jointly

and severally liable for any amounts ordered to be disgorged. *See* Doc. No. 112, at 11; Doc. No. 1 ¶¶ 12-14 (imposing joint and several liability for disgorgement of ill-gotten gains in this case against Non-Defaulted Defendants Elie Dorceus; Loyal Experience Dependable; and LED, where the United States alleged that Dorceus, directly and through Loyal Experience Dependable and LED, owned and operated tax preparation stores in Florida under the name LED Tax Services); *see also Barwick II*, 2018 WL 1135414 at *2, *report and recommendation adopted by* 2018 WL 115701 (imposing joint and several liability for disgorgement of ill-gotten gains in a case with similar allegations).

As to the amount to be disgorged, the United States submits that $1,251,456.54 is a reasonable approximation of the Defaulted Defendants' ill-gotten gains. To support this figure, the United States submitted a declaration from IRS Revenue Agent Christopher Dickerson. Doc. No. 134-2. Agent Dickerson obtained the Electronic Filing Identification Numbers ("EFIN") related to the Defaulted Defendants. *Id.* ¶ 4.[5] The IRS maintains a database—the Electronic Fraud Detection System ("EFDS")—that can track tax returns electronically filed by certain EFIN holders. *Id.* ¶ 5. The EFDS can generate a report that shows the claims made on each tax return filed using a specific EFIN, including the information reported on each line of the tax return. *Id.* Agent Dickerson obtained EFDS reports for tax returns filed in 2013, 2014, and 2015 using the EFINs associated with the Defaulted Defendants. *Id.* ¶ 6. Those reports were filed as Exhibits B, C, and D. They show, among other things, which customers filed a Schedule A, which customers filed a Schedule C, which customers claimed the EITC, and which customers claimed a fuel tax credit.

---

[5] Agent Dickerson's declaration, Doc. No. 134-2, and the declaration from the United States' paralegal, Amanda Reinken, Doc. No. 134-3, are not entirely consistent in their terminology, but it appears that the EFINs that appear in Agent Dickerson's declaration are associated with the Defaulted Defendants and that the information the IRS provided in this case is for Mr. Demesmin's LBS store for 2013 and for Unik Tax Refund for 2014 and 2015.

The reports do not show which customers filed a Schedule F.   However, Agent Dickerson avers that the IRS Service Center provided him with a list of customers of the Defaulted Defendants that filed a Schedule F in 2014.   *Id.* ¶ 10.   That list was filed as Exhibit E.   Collectively, Exhibits A-E show all customers who had tax returns prepared by the Defaulted Defendants from 2013-2015.[6] They also show which customers' returns had a feature (such as a Schedule C or Schedule F) that was commonly falsified by the Defaulted Defendants.

In addition to obtaining the list of customers, the United States subpoenaed records from the Defaulted Defendants' tax refund processors, EPS Financial and Refundo, Inc.   *See generally* Doc. No. 134-3.   The United States has submitted records obtained from EPS Financial and Refundo, Inc., that have been authenticated by records custodians.   *See* Doc. Nos. 134-5 and 134-6.   Those spreadsheets were filed as Exhibits F through Q.   Collectively, those spreadsheets show the fee that each of the Defaulted Defendants' customers paid to have their tax return prepared in the relevant years.

The United States' paralegal, Amanda Reinken, has averred that, after receiving the above-described information, she combined the EFDS reports from the IRS with the fee information received from EPS Financial and Refundo, Inc. for the respective years: "By cross-referencing customer names and social security numbers, I input the information from the IRS's EFDS reports and the fee information obtained from EPS Financial and Refundo, Inc. into a single spreadsheet for tax returns filed in 2013, a single spreadsheet for tax returns filed in 2014, and a single spreadsheet

---

[6] For some of the customers on Exhibit B, there is no tax return preparer listed, and the EFIN column is blank.   For all but one of those customers, the United States did not obtain any information about the fee the customer paid; thus, those customers are not included in the amount I recommend the Defaulted Defendants be ordered to disgorge.   As for the remaining customer (Demetra Mitchell), her name and tax return information appear on the Fee Detail Report submitted by EPS Financial for one of the EFINs associated with the Defaulted Defendants.   *See* Exhibit F.   Thus, it appears that Ms. Mitchell was a customer of the Defaulted Defendants and that the fees she paid to have her tax return prepared are properly included in any order of disgorgement.

for tax returns filed in 2015." Doc. No. 134-3 ¶ 9. She then added the information about customers who filed a Schedule F in 2014 to the combined spreadsheets. *Id.* ¶ 10. The combined spreadsheets were filed as Exhibits T, U, and V.

Next, Paralegal Reinken filtered the combined spreadsheets to isolate tax returns claiming: (1) farming income and/or expenses reported on a Schedule F; (2) a fuel tax credit (but not claiming farming income or expenses); (3) unreimbursed employee business expenses reported on a Form Schedule A (but not claiming farming income or expenses or a fuel tax credit); (4) self-employed business income and/or expenses reported on a Schedule C (but not claiming farming income or expenses, a fuel tax credit, or unreimbursed employee business expenses on a Schedule A); and (5) the EITC (but not claiming farming income or expenses, a fuel tax credit, unreimbursed employee business expenses on a Schedule A, or self-employed business income and/or expenses reported on a Schedule C). *Id.* ¶ 11. By isolating these categories, she ensured there would be no overlap in tax returns when she determine the total amount of fees for these categories and that no tax return was counted twice when she determined the amount subject to disgorgement. *Id.* ¶ 12.

Paralegal Reinken then calculated the amounts to be disgorged. The results are summarized below:

### Information for 2013

| Issue | Number of Returns | Fees |
|---|---|---|
| Unreimbursed Employee Business Expenses on Schedule A | 8 | $2,469.00 |
| Self-Employed Business Income and/or Expenses on Schedule C (but no Schedule A) | 400 | $249,324.23 |
| EITC (but no Schedule A or Schedule C) | 101 | $56,983.75 |
| **TOTAL FOR 2013** | | $308,776.98 |

**Information for 2014**

| Issue | Number of Returns | Fees |
|---|---|---|
| Farming Income and/or Expenses on Schedule F | 210 | $56,809.40 |
| Fuel Tax Credit (but no Schedule F) | 5 | $654.05 |
| Unreimbursed Employee Business Expenses on Schedule A (but no Schedule F or fuel tax credit) | 40 | $7,240.98 |
| Self-Employed Business Income and/or Expenses on Schedule C (but no Schedule F, fuel tax credit, or Schedule A) | 801 | $488,944.06 |
| EITC (but no Schedule F, fuel tax credit, Schedule A or Schedule C) | 107 | $61,071.97 |
| **TOTAL FOR 2014** | | $614,720.46 |

**Information for 2015**

| Issue | Number of Returns | Fees |
|---|---|---|
| Unreimbursed Employee Business Expenses on Schedule A | 6 | $2,275.00 |
| Self-Employed Business Income and/or Expenses on Schedule C (but no Schedule A) | 555 | $288,818.74 |
| EITC (but no Schedule A or Schedule C) | 82 | $36,865.36 |
| **TOTAL FOR 2015** | | $327,959.10 |

**Total**

| Year | Fees |
|------|------|
| 2013 | $308,776.98 |
| 2014 | $614,720.46 |
| 2015 | $327,959.10 |
| **TOTAL** | **$1,251,456.54** |

*See* Doc. No. 134-3 ¶¶ 13-27 and Exhibits T, U, and V.

I recommend that the Court find that $1,251,456.54 is a reasonable approximation of the Defaulted Defendants' ill-gotten gains.  This amount encompasses the years for which the United States has alleged that the Defaulted Defendants engaged in fraudulent tax practices and focuses on the categories where the complaint alleges a widespread pattern of abusive claims.  The United States has also taken steps to ensure that no return was counted twice in determining the amount of disgorgement.   In addition, this amount does not include all of the categories where the complaint alleges a pattern of abusive claims (for example, returns that claimed refundable education credits are not included).   Moreover, Paralegal Reinken has averred that she was not able to identify the fee for every customer identified in the IRS reports who filed a Schedule A, C, or F, claimed the EITC, or claimed a fuel tax credit in 2013, 2014, and 2015 because the reports from EPS Financial and Refundo, Inc., did not show the amount of the fee disbursed for every tax return identified in the IRS's reports.  *Id.* ¶ 28.   Accordingly, the total amount requested by the United States likely understates the Defaulted Defendants' ill-gotten gains, highlighting its reasonableness.   The Court has already approved a similar method for calculating the amount of disgorgement as to the Non-Defaulted Defendants.  *See* Doc. Nos. 97, 97-1, 112; *see also Stinson III*, 729 F. App'x at 899

(affirming disgorgement order based, in part, on all returns filed with a Schedule A claiming unreimbursed business expenses).

Because the United States has established a reasonable approximation of the Defaulted Defendants' ill-gotten gains, the burden shifts to the Defaulted Defendants to demonstrate that the United States has not presented a reasonable approximation.  The Defaulted Defendants did not respond to the motion for default judgment or otherwise rebut the United States' showing. Accordingly, I recommend that the Court order the Defaulted Defendants to disgorge $1,251,456.54.

## V.    RECOMMENDATIONS.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the Court:

(1)    **GRANT** the United States' Motion for Default Judgment Against Yves Demesmin, Unik Tax Refund, LLC, and YvesDemesmin, LLC (Doc. No. 134);

(2)    **ENTER** a permanent injunction against the Defaulted Defendants in a form approved by the Court;

(3)    **ENTER JUDGMENT** in favor of the United States and against the Defaulted Defendants, jointly and severally, in the amount of $1,251,456.54 on the United States' claim, brought under 26 U.S.C. § 7402, for the disgorgement of the ill-gotten gains the Defaulted Defendants received for the preparation of falsified tax returns; and,

(4)    **DIRECT** the Clerk to close the file.

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written

objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on January 10, 2019.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy